UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

RAFAEL GOMEZ-URANGA,

Petitioner,

v.

BRIAN ENGLISH,

Respondent.

CAUSE NO. 3:26cv539 DRL-SJF

OPINION AND ORDER

Immigration detainee Rafael Gomez-Uranga filed a *pro se* amended petition for a writ of habeas corpus under 28 U.S.C. § 2241, alleging that he is unlawfully confined in violation of the laws or Constitution of the United States. The respondent answered the petition, and Mr. Gomez-Uranga filed a reply. The amended petition is ready to be decided.

Mr. Gomez-Uranga is a Cuban citizen who entered the United States in 1999. From 2003 to 2018, he was convicted on five separate occasions for burglary, loitering, resisting arrest, conspiracy to commit interstate transportation of stolen property, armed burglary, and grand theft. On August 24, 2023, an immigration judge ordered him removed to Cuba. On September 7, 2023, United States Immigration and Customs Enforcement (ICE) released him on conditions of supervision due to its inability to remove him. On February 5, 2026, Mr. Gomez-Uranga transferred from criminal custody to immigration custody. He is currently held at the Miami Correctional Facility.

Upon his transfer, ICE informed Mr. Gomez-Uranga of its intent to remove him to Mexico by serving him with a notice of removal. Mr. Gomez-Uranga refused to sign the

portion of the notice confirming his receipt because he had no ties to Mexico and "fear[ed] he would be kidnapped or tortured." He also declined to provide a written statement regarding his concerns about removal to Mexico. On March 31, 2026, ICE again attempted to serve him with a notice of removal to Mexico, but Mr. Gomez-Uranga refused to sign it, again citing his fears but expressing "his willingness to cooperate with removal to Cuba or any third country other than Mexico." On April 4, 2026, ICE notified him of his failure to cooperate with removal efforts and that he would remain in immigration custody until he cooperated. On May 12, 2026, Mr. Gomez-Uranga refused to sign a third notice of removal to Mexico. On June 23, 2026, ICE served him with a warning, advising him that he could be subjected to criminal prosecution for his refusal to cooperate, which Mr. Gomez-Uranga also refused to sign to confirm receipt. The government has not afforded Mr. Gomez-Uranga a fear-based interview due to his refusal to cooperate with removal efforts.

The respondent first argues that the court lacks subject matter jurisdiction over Mr. Gomez-Uranga's habeas petition under 8 U.S.C. § 1252(g) and § 1252(b)(9). The court has thoroughly considered its jurisdiction to review post-removal-order immigration detention. For reasons given before, jurisdiction is secure insofar as this opinion goes. *See Liang v. English*, No. 3:25cv1052, 2026 WL 835853, 1 (N.D. Ind. Mar. 26, 2026) (Leichty, J.).

Turning to the merits, 8 U.S.C. § 1231(a)(6) gives the government the authority to detain a noncitizen while it effectuates a removal order. All noncitizens must be detained for a 90-day "removal period," which for Mr. Gomez-Uranga ended in November 2023. *See* 8 U.S.C. §§ 1231(a)(1)(A), (a)(2)(A). Beyond this 90-day period, certain classes of noncitizens may be detained even longer—what the statute calls inadmissible aliens (under 8 U.S.C.

2

§ 1182), those who have violated their nonimmigrant status conditions (under 8 U.S.C. § 1227(a)(1)(C)), those who have committed certain crimes, such as aggravated felonies, drug trafficking, or illegal firearm offenses (under 8 U.S.C. § 1227(a)(2)), those removable for national security or foreign relations reasons (under 8 U.S.C. § 1227(a)(4)), and those whom the Attorney General determines to be a risk to the community or unlikely to comply with the order of removal. These noncitizens "may be detained beyond the removal period" or released on conditions of supervision. 8 U.S.C. § 1231(a)(6).[1] The Warden relies on Section 1231(a)(6) as the basis for Mr. Gomez-Uranga's current detention.

"The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law," and "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). To avoid a constitutional due process problem with § 1231(a)(6), and specific to a noncitizen who is present within this country and who is ordered removed, the law requires that his detention be limited to a reasonable time — namely "a period reasonably necessary to bring about that alien's removal from the United States." *Id.* at 689; *see also id.* at 682, 690-91.

Any § 1231(a)(6) detention of a present-but-ordered-removed noncitizen has this limitation, as it guards against the possibility that he might be indefinitely detained should his removal not be reasonably achievable. Indefinite detention would raise a serious

---

[1] For noncitizens who don't fall in these categories, if they are not removed during the 90-day removal period, they must be released, subject to conditions of supervision. 8 U.S.C. § 1231(a)(3).

constitutional problem. *Id.* at 690; *see also Clark v. Suarez Martinez*, 543 U.S. 371, 378 (2005) (same). In short, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Zadvydas*, 533 U.S. at 699.

The historic writ of habeas corpus grants a federal court the authority to review a noncitizen's detention and to decide independently whether "a set of particular circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal." *Id.*; *see also* 28 U.S.C. § 2241(c)(3). "In answering that basic question, the habeas court must ask whether detention exceeds a period reasonably necessary to secure removal" and "should measure reasonableness primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal." *Zadvydas*, 533 U.S. at 699. When removal proves reasonably foreseeable, the court can consider other factors (such as risk of crime) and often will deny habeas relief; whereas, when removal seems attenuated or unlikely, the court will order the individual's release, albeit conditioned on appropriate terms of supervision and the noncitizen's compliance with these terms. *See id.* at 699-700. After all, the choice isn't between detention and a noncitizen "living at large," but between detention and a noncitizen's supervised release on conditions that he cannot violate. *Id.* at 696.

The law materially defers difficult judgments to the Executive Branch for a six-month period during which detention is considered presumptively reasonable to execute removal. *Id.* at 700-01. Even after, the court listens with care when the government's "foreign policy judgments"—such as the status of repatriation negotiations— are implicated and otherwise affords "appropriate leeway when its judgments rest upon foreign policy expertise." *Id.* at

4

700. A noncitizen "may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. Once he "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the government must respond with evidence sufficient to rebut that showing." *Id.* (cleaned up); *see also Suarez Martinez*, 543 U.S. at 385-86.

The petitioner bears the initial burden, and the court sees no reason today to alter this. *See* 28 U.S.C. § 2241; *Zadvydas*, 533 U.S. at 700; *see also Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011); *Espinoza v. Sabol*, 558 F.3d 83, 89 (1st Cir. 2009). Nor must the court engage the same constitutional dilemma that § 1231(a)(6) could present merely because this is a second period of detention and not his first. *See Zadvydas*, 533 U.S. at 690. The court may consider not just what led to his original detention and release years ago, to the extent still pertinent, but also what circumstances newly exist today. Despite the old adage, past isn't always prologue in this context, and just because removal couldn't occur before doesn't mean it can't reasonably occur today under renewed efforts. At the same time, nothing in § 1231(a)(6) and nothing in *Zadvydas* suggests that the mere passage of time erases everything about the initial showing to make it all irrelevant. *See also Vu v. English*, No. 3:25cv999, 2026 WL 194171, 11-14 (N.D. Ind. Jan. 26, 2026) (Leichty, J.); *cf. Kem v. Noem*, No. 3:25cv997, 2026 WL 100566, 10-11 (N.D. Ind. Jan. 14, 2026) (Leichty, J.).[2] After all, as the period of confinement grows, what qualifies as a reasonably foreseeable future conversely must shrink. *Id.* at 701.

---

[2] No one should read either *Vu* or *Kem* as indicating that an original showing always remains gospel or shifting the burden.

An immigration detainee's refusal to cooperate with removal efforts, under circumstances like today, precludes him from obtaining a favorable ruling on a claim under *Zadvydas*. The first federal appellate case to have addressed this issue appears to be *Pelich v. I.N.S.*, 329 F.3d 1057 (9th Cir. 2003). There, the immigration detainee refused to complete an application for travel documents to Poland, and Poland expressly required the information on the application to determine whether it would issue him travel documents. *Id.* at 1059. The immigration detainee further frustrated removal efforts by providing the government with conflicting information about his identity and family. *Id.* The Ninth Circuit reasoned that "the detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock" and held that "an alien cannot assert a viable constitutional claim when his indefinite detention is due to his failure to cooperate with the [government's] efforts to remove him." *Id.* at 1060-61.

Though neither the Supreme Court nor the Seventh Circuit appear to have addressed this precise issue in the immigration context, this seems a rather sensible rule—after all, one cannot typically create or self-inflict an alleged constitutional or other harm all one's own and then maintain standing to complain about it. *See, e.g., Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013); *see also Uzuegbunam v. Preczewski*, 592 U.S. 279, 285 (2021) (injury must be fairly traceable to defendant for standing to exist). Several federal courts that have addressed this concern in immigration cases have unanimously agreed with the Ninth Circuit. *See, e.g., Singh v. U.S. Att'y Gen.*, 945 F.3d 1310, 1314 (11th Cir. 2019); *Hook v. Lynch*, 639 F. Appx. 229 (5th Cir. 2016); *Kovalev v. Ashcroft*, 71 F. Appx. 919, 924 (3rd Cir. 2003); *Souleymane v. Olsen*, 2026 WL 785596, 4 (S.D. Ind. Mar. 20, 2026). This rule is also consistent

with 28 U.S.C. § 1231(a)(1)(C), which extends the removal period if an individual refuses to cooperate with removal efforts, and 8 C.F.R. § 241.5(a)(2), which requires such cooperation as a mandatory condition of supervised release.

Mr. Gomez-Uranga has been in detention for longer than six months, so the court turns to whether his removal is reasonably foreseeable. The respondent identifies Mexico as the only country under consideration for removal. Mr. Gomez-Uranga contends that he cannot be removed to Mexico because he will not consent and Mexico will not accept him for removal without his consent. To support this argument, he cites cases in which the government has represented that Mexico will serve as a third country for removals only if the individual will go there willingly. See *Lambert v. Montana*, 2026 U.S. Dist. LEXIS 74637, 6 (W.D. Tex. Apr. 6, 2026); *Delgado v. Bondi*, 2026 U.S. Dist. LEXIS 73854, 10 (W.D. Wash. Apr. 3, 2026). He can choose to refuse to cooperate, but then his continued detention is something of his own making—for the court is not persuaded by any of Mr. Gomez-Uranga's reasons for refusing to cooperate with removal efforts, and release on supervision remains conditional on his cooperation with removal.

With respect to the argument about some unwritten agreement, Mr. Gomez-Uranga cites *Navarro v. Lyons*, 2026 WL 816791 (D. Mass. Mar. 25, 2026), in which the district court there expressed some consternation when the government represented that about 6,000 Cuban citizens had been removed to Mexico without travel documents pursuant to a "standing (unwritten) agreement." But, whatever the concerns in that case, Mr. Gomez-Uranga has not translated those concerns to his situation. He has not reached this stage of concern because he has stymied the government's efforts at removal at each point. And still

unclear on this record is how any such agreement would be unlawful, how it specifically might violate Mr. Gomez-Uranga's rights under federal law, or why it would justify his refusal to cooperate with efforts to remove him to Mexico. Though Mr. Gomez-Uranga expresses concern over the lack of process "utilized by the government to remove Cuban nationals to Mexico," it is unclear precisely what type of process he believes is lacking, or how this omitted process relates to the unwritten agreement between the United States and Mexico. Moreover, the removal process is largely governed by federal statute, regulations, and policy, including the process for adjudicating an immigration detainee's fear-based claims.

Next, the parties do not dispute that Mr. Gomez-Uranga has expressed concerns about his removal to Mexico and that he has not received a fear-based interview, but the respondent explains that the reasons for not affording one are his refusal to reduce his concerns to writing upon his transfer to immigration custody and his repeated refusals to sign a notice of removal to confirm receipt. Mr. Gomez-Uranga does not explain why he refused to provide a written statement to support his request for a fear-based interview, and requiring the immigration detainee to reduce his concerns in writing does not seem an unreasonable prerequisite for a fear-based interview.

With respect to his refusal to sign the notice of removal, Mr. Gomez-Uranga represents that, if he had signed the notice, "he would have been promptly removed to Mexico without a second thought." Significantly, Mr. Gomez-Uranga offers no explanation for why he believes that signing the notice of removal would have had this consequence. Nothing in the notice of removal suggests this; to the contrary, the substantive portion of

8

the notice consists of a single sentence: "This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) intend to remove to you <u>Mexico,</u>" and signing this form on the designated line would have served only to confirm that Mr. Gomez-Uranga had received the notice.

Mr. Gomez-Uranga further argues that the government could have afforded him a fear-based interview notwithstanding his refusal to cooperate. While true, the court cannot fault the government for declining to do so. Mr. Gomez-Uranga has made his intent to refuse to cooperate with efforts to remove him to Mexico clear from the moment the government re-detained him. He has also refused to reduce his Mexico-related concerns to writing, which strongly suggests that this refusal would extend to good faith participation in a fear-based interview. Even now, Mr. Gomez-Uranga's Mexico-related concerns are vague, and it remains entirely unclear as to why Mr. Gomez-Uranga believes that Mexico, uniquely among every other country, poses a threat of kidnapping or torture to him.

To summarize, the parties agree that Mr. Gomez-Uranga is refusing to cooperate with efforts to remove him to Mexico and that his removal to Mexico would occur within the reasonably foreseeable future but for his refusal to cooperate. Though the court might be reluctant to find that refusal to cooperate precludes habeas relief under some other set of circumstances, such circumstances are not present here. The government reasonably declined to afford Mr. Gomez-Uranga a fear-based interview given his recent course of refusing to cooperate with removal efforts, and it is entirely unclear why the unwritten nature of the removal agreement between the United States and Mexico would justify this refusal. It also remains unclear as to why Mr. Gomez-Uranga fears that he would be tortured

9

or persecuted if he was removed to Mexico. Therefore, Mr. Gomez-Uranga's arguments do not justify his refusal to cooperate with removal efforts to Mexico, so he cannot prevail on his claim under *Zadvydas* challenging the length of his detention. No other claims remain, so the court denies the habeas petition.

For these reasons, the court:

(1) DENIES the amended petition for writ of habeas corpus [14-1]; and

(2) ORDERS the clerk to enter judgment and close this case.

SO ORDERED.

July 29, 2026

*s/ Damon R. Leichty*
Judge, United States District Court